Filed 2/2/21  P. v. Avelino CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CATALINO AVELINO,<br><br>    Defendant and Appellant. | G057775<br><br>(Super. Ct. No. 15HF1405)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John D. Conley, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Catalino Avelino of four counts of lewd or lascivious acts committed against children under age fourteen for sexually abusing three of his step-granddaughters. (Pen. Code, § 288, subd. (a); all further statutory references are to this code.) The jury found true the allegation that these sex crime counts involved multiple victims. (§ 667.61.) The jury also convicted Avelino on three other counts of attempting to commit lewd acts against the girls. (§§ 664, 288, subd. (a).) The trial court sentenced Avelino, who was 65 years old when he was arrested for the offenses, to 18-years-to-life in prison. The sentence consisted of an indeterminate 15-year term on one completed count, similar concurrent terms on the other completed offenses, a consecutive middle term of three years for one of the attempt counts, and similar concurrent terms for the other attempts.

Avelino's sole claim on appeal is that the *Miranda*[1] waiver he gave to the police was ineffective given the totality of the circumstances, including his "impaired intellectual disability range." He asserts the incriminating statements he made to the officers were involuntary and should have been excluded. As we discuss, the trial court during a pretrial hearing heard extensive evidence concerning the circumstances of Avelino's waiver, including the testimony of Avelino's expert witness, a neuropsychologist who interviewed him. The expert identified deficits in Avelino's reading and verbal comprehension, but acknowledged that in several tests administered as part of a cognitive evaluation that Avelino scored in the average range, and his IQ did not fall into the range considered to be intellectually disabled. Under the governing standard of review, we cannot say the trial court erred in finding Avelino's express acknowledgment that he understood his *Miranda* rights made his waiver effective and that his statements were voluntary. We therefore affirm the court's pretrial ruling and the judgment.

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

## FACTUAL AND PROCEDURAL BACKGROUND

Because Avelino's challenge concerns his police interview and *Miranda* waiver, we begin there.

Avelino was arrested on November 19, 2015, a Thursday, and spent the weekend in jail. The circumstances of his arrest are not in the record, but it appears he was set to be released from jail the following Monday since no formal charges had been filed against him. The court's minutes for that date state, "District Attorney faxed over refusal paperwork to the jail."

Before he was released, Detectives L. Henriquez and J. Perez, who were wearing casual attire rather than police uniforms, contacted Avelino in the section of the jail where inmates are processed for release. Avelino was also wearing casual clothes; it appears he was still handcuffed. The detectives, who were sworn members of the Orange County Sheriff's Department, identified themselves by name and as an "[i]nvestigator," but did not explicitly state they were members of law enforcement.

Henriquez told Avelino that Perez wanted to ask him some questions; Avelino agreed ("okay"). Along with a jail deputy, they led Avelino into a holding cell, where he was uncuffed and directed to sit on a bench. When asked whether he spoke or understood English, Avelino responded, "No." Henriquez explained that Perez did not speak Spanish, so she would translate his questions and Avelino's answers, respectively.

Henriquez then read Avelino his *Miranda* rights, which she prefaced with a reminder that he was in jail, "under arrest [and] I need to read you your rights." She continued, "When I read you your rights what I need from you is if you understand say yes, if you don't understand say no, and I will explain. Understand?" Avelino confirmed that he understood ("Yes"), and Henriquez proceeded to review each of his rights individually with him, which, after each one, he confirmed he understood ("Yes"). Henriquez then turned the interview over to Perez, who had been setting up an audio recorder. The interview lasted just under an hour.

3

Perez began by asking identifying questions, including where Avelino lived (Dana Point), whether he was married or single (separated), and the name of his wife (C.P.). Avelino explained that he and C.P. had been separated for about five years, breaking up after she did not want to move from Laguna Niguel to a new home with him. They previously lived together for about 10 years. During that time, two of C.P.'s children also lived with them, as did several of C.P.'s grandchildren. The grandchildren included two sisters, K.D. and K.M.

The testimony of K.D. and K.M., along with that of their cousin, L.G., who did not live with them, indicated that Avelino abused each of them in separate instances beginning when they were as young as first grade (K.M.), seven years old (L.G.), and "very young" (K.D.). The abuse continued for several years, until K.D. and K.M.'s mother began "having issues" with Avelino, which the record does not identify, and "kicked him out" of the Laguna Niguel home.

During Avelino's jail interview, after the initial background questions, Perez turned the topic to whether Avelino had ever bathed K.D. or K.M., helped dress them, or done their laundry, all of which Avelino denied. He also denied bathing L.G. or seeing any of the girls naked ("No, never"). He further denied that anyone had ever accused him of touching the girls inappropriately ("No, never"), or that he had ever done such a thing ("No").

When Perez stated directly that the girls claimed Avelino "touched their vagina, and breast," Avelino demurred that "the girls were very loving towards him because he would buy them food and he would go with his wife to buy them clothes and . . . if he touched them it was when he hugged them." When Perez pressed that "the little girls are, are upset and hurt that you touched them" and "right now is the time to tell us" because "the only thing [they] want[] to know is that you feel bad for doing this," Avelino again deflected. He answered that "it's possible I feel bad, after I've helped

them so much," but noted "[t]hey threw me out, she didn't want to[]," apparently referring to his wife.

Perez conceded, "if it was by accident, I need to know." Avelino agreed, "[i]t's possible that, excuse me, that it happened by accident." Avelino thereafter continued to insist that any touching was only accidental or as a "hug," even when Perez stated he knew Avelino had touched K.D.'s breast, which Avelino denied ("Ah, never"). Avelino later admitted that "of the three" girls, he only touched K.D.'s breast, and only once.

K.D. was the oldest of the three girls. When she was 13 or 14 years old, Avelino admitted he "thought it was easy to touch her and tell her she has beautiful breast [*sic*]." He seemed to also admit touching her vagina in a later incident, and volunteered it was "at the pool," which corresponded, Perez said, with an allegation *K.M.* stated occurred when she was only ten years old.

Avelino denied it had been K.M., stating it was K.D. He maintained that the touching was innocent, while "swimming" with K.D., who "always liked that I thr[e]w her up" in the air. Avelino explained that "her mom was there with us in the chair sitting down there" by the pool.

When Perez repeated that K.D. stated Avelino touched her vagina "in her room," and that "the girl is traumatized with what happened," and needed to know "that you . . . repent for what you did," Avelino responded, "Of course I am repent[ant]." But he continued to insist that any touching had only been at the pool.

Avelino denied touching L.G., claiming that she and her mother "wouldn't go to the house," and he also described L.G.'s mother as an "instigator." He insisted he never touched L.G. inappropriately, even accidentally, nor did he touch K.M. When Perez wondered, "So then why do they say yes [he did abuse them]," Avelino replied, "[t]hey are blaming me" and "accusing me"; he added, "I don't know why they are lying" and "they are lying and committing a fraud . . . ."

5

Perez then said, "It's not true and you know it" and "You know it's not true," while telling Avelino (through Henriquez) that he "just wants you to be honest." Nevertheless, Avelino maintained that if he were going to "blame myself," it would only be for accidental touching "[i]n the game at the pool," where "in the pool it's true but no, no, I didn't do it [on] purpose." When Perez countered that "[i]t's true that you touched" L.G., Avelino averred, "Swear to [G]od no, I never touched her . . . ."

If he touched L.G., it was only on her breast at the pool, not her vagina, but again only accidentally because sometimes he had to grab the girls to keep them from drowning.

Avelino's denials began to waver once Perez told him (falsely) that K.D. and K.M.'s older brother, M.R., said that he "specifically remembers [Avelino] touching [K.M.] and he saw it."[2] When Perez said M.R. recounted, "One time you, in your room you touched" K.M. when she "was in fourth grade," Avelino said, "Yes," but then added, "Look that one time I carried [K.M.], that's true." Avelino conceded "it seem[s]" he might have touched her then. He also admitted telling K.M. at the time, "[K.M.] you are going to have big breast [*sic*] when you are a young lady."

Perez stated that was not the incident he was referring to; rather "this specific time that [I] am asking [about] is he showed [M.R.] and [K.M.] pornography. [M.R.] had left the room, but came back in and saw" Avelino "touching [K.M.'s] vagina." Avelino admitted that "my wife would tell me don't bring that pornography the

---

[2] At trial, M.R. testified that while he told a police investigator (Perez) in a phone interview in 2015 that Avelino did *not* show him and K.M. his (Avelino's) "'porn stash,'" "if you asked me now, I would say yes." He testified that Avelino had called K.M. and him into his room and showed them a video of a man and a woman having sex. M.R. acknowledged that in his phone interview with Perez, when M.R. was about 16 or 17 years old, he had stated only that Avelino "'would talk about perverted things, like a porn stash, and he would watch porn sometimes'" and that Avelino "'showed me [M.R.] like porn sites and stuff.'" But M.R. denied in the interview that K.M. or, implicitly K.D., were present, stating, "'No. I don't think he would pull it out in front of them.'"

6

kids are going to see it.  One time . . . when I came back from the store with [his wife, C.P.] they had the book open they were looking at it."  Avelino insisted it was "the three kids . . . in his room looking at the porn," but denied "showing pornography to them."

Finally, Avelino admitted abusing K.M. stating, "I will say the truth." Avelino then confessed, "She asked me to[]," telling him, "Little Old Man touch me, touch me she tells me.  I want to feel what it feels like."  Admitting this occurred "[i]n [his] room," Avelino said, "I told her no little one, I said your mom is going to come and that [*sic*]," which Henriquez explained to Perez meant, "Your mom might come in here."

Avelino admitted he touched K.M. on that occasion "[j]ust over the vagina," but "[j]ust one, that one time," and he touched her breast another time in a different incident.  When Perez insisted, "She told us it happened more than once," Avelino answered, "They're lying" and just wanted to "blame" him, which Henriquez explained to Perez meant "they just want to get him in trouble."  Nevertheless, when Perez repeated that the girls "are traumatized" and "need to know why you did it and if you repent," Avelino answered, "I repent for everything" and admitted, "It was wrong."

Perez offered Avelino the opportunity to "apologize" to the girls by "mak[ing] a note and we can give it to them."  Avelino agreed and dictated the following to Henriquez before signing it:  "[K.D.] please give me the opportunity to apologize for what happened.  The same to the others.  All I want is sorry [*sic*] and would like to spend more time with you guys even though it's from a distance.  That there isn't any grudges [and] that nothing will ever happen, and the day that we get to see each other again we [will] see each other with joy."

Avelino confirmed his statement with Henriquez and Perez stating, as to K.M., he "touched her breast and vagina" when she was around 12 or 13 years old; he touched L.G. only on her breast; and K.D. "on the breast and the vagina at the pool" and "in the room."  Before confirming his statement, Avelino stated he felt "more relaxed" having made his admissions.  As the interview closed and the jail deputy put the

7

handcuffs back on Avelino, he told the deputy in Spanish, "I'm going to sleep happy tonight."

Avelino explained to the deputy, "Yes. Yes because I felt bad also about this," trailing off and adding, "I felt like this was going to happen, I had a feeling. But today I feel happy." The deputy stated in Spanish, "That's why they asked for you to say all of the truth," and Avelino agreed, "Yes."

At the pretrial hearing on Avelino's motion to suppress his statements, the trial court reviewed the transcript and audio recording of the interview and heard testimony from two witnesses. One was Investigator Henriquez; the other was a neuropsychologist called by the defense, Dr. Francisco Gomez.

Henriquez confirmed the accuracy of the audio recording. She verified that Avelino affirmatively answered "yes" after she read him each of his *Miranda* rights and that he did not express any confusion or lack of understanding about those rights. She testified that throughout the interview Avelino did not ask her to repeat or clarify any questions. Henriquez also testified that Avelino asserted himself to correct her at "several points" during the interview; she gave as one example that when she "misspoke and said another street [for his address,] he corrected me."

Dr. Gomez testified at the suppression hearing that he "interviewed, tested and evaluated Mr. Avelino . . . for the purpose of determining whether or not he understood his *Miranda* rights during that November 2015 contact with the police." He concluded: "In my opinion, I don't think he gave a knowing and intelligent waiver of his *Miranda* rights."

Gomez based his opinion on standardized testing that indicated Avelino had issues related to his reading and verbal comprehension, as well as in processing information quickly. Avelino was 68 at the time he was tested, and he had only three years of formal schooling in Mexico. Gomez explained that Avelino's low verbal IQ and reading comprehension scores translated into a range between kindergarten and second

8

grade level capability in those categories. Nevertheless, Gomez acknowledged that Avelino's intellectual abilities as measured by the standardized testing did not fall below the threshold to indicate even mild mental retardation. In a number of neurological tests, Avelino scored in the average range, some of which indicated he had "no difficulty" with verbal problem solving or cognition for someone his age.

Gomez opined that based on his "22 years of . . . experience doing forensic evaluations" and "knowing the Latino culture very well," individuals from Latin American countries with low education and low "acculturation" are more likely to acquiesce to an authority figure. He based his low acculturation assessment of Avelino on factors including that he "has been in the country—what?—40 years, and he still doesn't speak English. His English is like at a survival level." Gomez described low acculturation as a "cultural style" that "doesn't always apply to everybody" of a demographic, but might include "some general tendencies" such as those exhibited by Avelino in his interview with Gomez. As Gomez recounted, "He was very passive. Low acculturation. Low education. Okay. He is not likely to question me. He wasn't asking direct questions. . . . [¶] He just was following what I was asking him."

Gomez agreed that Avelino appeared to be responsive to the officers' questions in his police interview. In Gomez's interview, Avelino's responses indicated he understood the difference between right and wrong, understood the nature of the allegations against him, largely seemed to comprehend Gomez's questions, and he was able to provide responsive answers. Gomez listened to "the entirety of" Avelino's recorded police interview, but mainly focused on "the *Miranda* part." He acknowledged that Avelino did not ask the officer to repeat any portion of the *Miranda* warnings, nor did he tell the officers that he "didn't understand or was confused" about his rights.[3]

---

[3]     In the factual background portion of his appellate brief, Avelino summarizes Gomez's *trial* testimony in which Gomez emphasized Avelino's "risk for suggestibility." Gomez based his suggestibility assessment on factors including

The trial court denied Avelino's suppression motion. The court found the motion "very valid" in that it was possible, theoretically, that "someone with Mr. Avelino's limited education and experience could very well not have understood the *Miranda* rights" as read to him, "or might be susceptible to suggestion."

"The problem is," the court explained, "when you listen to the audio, you don't see any evidence of a problem. Dr. Gomez, on an academic level, sees the defendant's limited education, and has concerns whether the defendant understood, whether he was suggestible." In contrast, the court observed, "I don't see any signs of officers putting words in his mouth. And I think there were no threats. There were no promises. There was no indication of being bullied. Everything was handled very professional and low key. [¶] So we have a 55-minute example [i.e., the length of the police interview] of how he was thinking at the time, and I don't see any evidence that he did not understand or he was confused." The court found that the officers' "refusal to accept a denial" did not make the interview coercive or Avelino's *Miranda* waiver invalid.

The court further observed that Avelino's cognitive "testing results, as indicated by the prosecutor, were mixed. Many scores were average. A long time in the

Avelino's low IQ, "cognitive" or "neurocognitive" impairments, a passive or "non-confrontational nature," and "cultural factors, such as an expectation that one should acquiesce to authorities." Gomez testified at trial that Avelino's risk of suggestibility included problems with memory and memory retrieval and that a suggestible person could find a situation, such as a police interview, so stressful that he or she would make untrue admissions in order to end "the ordeal." Gomez testified that studies had shown this effect could occur within as short a time frame as 30 to 45 minutes. Avelino does not indicate whether Gomez made these same points in his pretrial testimony at the suppression hearing, though the court's comments reflect it was well aware of the problem presented by suggestibility. In any event, we review the correctness of a trial court's ruling at the time it was made, not by reference to evidence produced later at trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1007-1008, fn. 23; *People v. Welch* (1999) 20 Cal.4th 701, 739; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.) Avelino did not testify at the suppression hearing or at trial.

10

United States. No language barrier at all, because the interview is in Spanish." The court noted that the interview showed Avelino was "not reluctant to correct the officer, when the officer says something wrong." The court highlighted from the transcript a few examples, including on pages "35, 42, and 48," "'It was not [K.M.],' he corrects," on "[p]age 38, he corrects another [alleged] version of one of the victims," and, "[o]n page 92, in respect to [L.G.], 'I did not touch her vagina.'" The court concluded, "So when you look for signs that his will is being overborne or he doesn't really understand what is happening, I don't see it."

Finally, the court recalled, "in terms of voluntariness," Avelino's concluding statements in the interview: "I'm going to sleep happy tonight"; "I felt bad also about this"; "I felt like this was going to happen"; and as he was handcuffed again, "I had a feeling, but today I feel happy." The court remarked, "So this is not a reluctant person, being badgered. It is someone who seems happy to get it off his chest."

In summary, the court observed, "So, yes, there potentially is a problem with a person like the defendant here, but 55 minutes of experience shows there was no actual problem." The court referenced several cases in support of its ruling: "A 15-year-old with a 47 IQ," where "a knowing, intelligent, and voluntary waiver" was found; another case involving "Low IQ and actual brain damage," but nevertheless a sufficient "showing [the *Miranda* waiver was] knowing and intelligent"; and a third case with the same result involving a "13-year-old, low IQ and schizophrenic." (Citing *People v. Lewis* (2001) 26 Cal.4th 334, 383; *People v. Kelly* (1990) 51 Cal.3d 931, 951; *In re Norman H.* (1976) 64 Cal.App.3d 997, 1001.) The court concluded against this backdrop that "the academics see it a lot differently than the practical courts see it."

Following his conviction and sentencing as noted above, Avelino now appeals the trial court's denial of his suppression motion.

11

**DISCUSSION**

*Miranda* warnings provide a procedural safeguard to protect an individual's Fifth and Fourteenth Amendment right against self-incrimination. (*Florida v. Powell* (2010) 559 U.S. 50, 59.) *Miranda* thus requires notice to the defendant of the right to remain silent. (*Miranda*, *supra*, 384 U.S. at p. 469.) When *Miranda* warnings are given and understood by the accused, but he or she nevertheless speaks to the police, the defendant impliedly waives the right to remain silent—provided the statement is uncoerced. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382.)

To be effective, a defendant's *Miranda* waiver must be made "'"voluntarily, knowingly and intelligently."'" (*People v. Combs* (2004) 34 Cal.4th 821, 845 (*Combs*), quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421.) Avelino challenges the first factor. He contends his *Miranda* waiver was ineffective and his inculpatory statements must be excluded because they were involuntary. Relinquishment of *Miranda* rights, including the right to remain silent, "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Combs*, at p. 845.)

In reviewing the voluntariness of a *Miranda* waiver, "[w]e accept [the] trial court's factual findings, provided they are supported by substantial evidence, but we independently review the ultimate legal question." (*People v. Scott* (2011) 52 Cal.4th 452, 480 (*Scott*).) That question is simply "'whether the challenged statement was illegally obtained.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.'" (*People v. Neal* (2003) 31 Cal.4th 63, 79.) Avelino, as the appellant, bears the burden of demonstrating error in the trial court's ruling. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.)

12

Avelino asserts "[t]he interrogation was coercive in that it contained implied promises of leniency and confidentiality." In our view, the record does not support this conclusion.

"In general, "'any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law.'" [Citations.] In identifying the circumstances under which this rule applies, we have made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 339-340.) "[M]erely advising a suspect that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a confession involuntary." (*People v. Davis* (2009) 46 Cal.4th 539, 600.)

Avelino does not explicitly articulate how the officers made him an offer of leniency or confidentiality. Both in his briefing and during oral argument he seems to find an implied promise of lenient treatment in "the detectives stress[ing] that the only objective of the interrogation was to provide solace to the three complainants." He quotes Perez's statements that the girls "*just* want to know he is sorry" and the "*only thing about all of this is we want* to [sic] these young lad[ies] . . . are traumatized. The only way to help them is by knowing the truth. . . . *[W]e need to know why you did it, and if you repent*, you understand me?" (Initial italics added; Avelino's bolded italics.)

13

This claim fails in light of the overall record. The claim is untenable given Henriquez's *Miranda* admonitions at the outset that "You have the right not to say anything" and "What you say today can be used against you in a court." Avelino expressly stated he understood these rights. These warnings "touched . . . the bases required by *Miranda*," informing Avelino "that he had the right to remain silent," and "that anything he said could be used against him in court." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 203.)

On appeal, Avelino suggests the officers' "deceptive statements that the purpose of the interrogation was *solely* for the benefit of the [girls'] emotional needs" (italics added) undercut and nullified his prior understanding. But his statements at the end of the interview reflect otherwise. As the discussion ended, Avelino said, "I felt like this was going to happen, I had a feeling." He also stated he was "happy" about the conversation and he would "sleep happy tonight," which does not suggest Avelino failed to grasp the situation. To the contrary, other courts have recognized, "The compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also brings great psychological relief." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 583–584, fn. omitted.)

Avelino also contends his confession was involuntary because the detectives "lied . . . about the evidence against him," including by telling him M.R. reported seeing him "touch his sister's vagina," which M.R. denied both in his interview during Perez's investigation and at trial. Given this record, we must disagree.

"'Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary.' [Citations.] Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) In *Farnam*, the Supreme Court concluded police subterfuge that defendant's fingerprints were found on the victim's wallet was "unlikely

14

to produce a false confession." (*Ibid.*) Similarly, a detective implying "at various times that he knew more than he did or could prove more than he could" does not "offend any constitutional guaranty" because it is not reasonably likely to result in an *untrue* admission. (*People v. Jones* (1998) 17 Cal.4th 279, 299.)

The same is true here. Avelino does not suggest how Perez's false overstatements about what M.R. actually told him (which was restricted to Avelino's penchant for pornography, not that he abused anyone) were likely to produce a false confession. There is no indication, for example, that Avelino—though innocent—was playing a hero by accepting blame that rightfully belonged to M.R. or anyone else. Indeed, Avelino continued to deny touching any of the girls inappropriately despite Perez's assertion that M.R. "says he specifically remembers that." Avelino responded, "Don't remember" and "No, no" to Perez's insistence M.R. told him this, and he continued his tack of denying inappropriate touching, admitting only that he told K.M. she would have large breasts "when you are a young lady." No evidence shows the requisite "*proximate* causal connection between the deception or subterfuge and the confession." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.)

Finally, Avelino argues that his "mental deficits play an important role in evaluat[ing voluntariness] because a person with low IQ is 'more susceptible to subtle forms of coercion.'" (Quoting *Com. of Northern Mariana Islands v. Mendiola* (9th Cir. 1992) 976 F.2d 475, 485.) "[W]hile mental condition is relevant to an individual's susceptibility to police coercion, a confession must result from coercive state activity before it may be considered involuntary." (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

Here, neither predicate for reversal is present: neither a mental deficit precluding the possibility of a voluntary waiver or indicating an involuntary waiver, nor wrongful police conduct. Dr. Gomez estimated that Avelino's IQ was "somewhere between 87 and 70," pegging the number in his report as "likely in the lower IQ range of

15

84 to 87" and in his hearing testimony as "probably in the 70 range," which did not qualify him as being "in the mildly, mentally retarded range."[4]

As the trial court commented, theoretically "there could be a problem here with this. But then when I look at the interview, where is the problem? I'm not seeing it in the interview." Our review confirms this assessment. Avelino's answers indicated voluntary participation in the interview, an awareness of its stakes, and consistent denials of culpability, all while minimizing and explaining his actions innocently.

Henriquez testified she did not have to repeat any questions for Avelino, nor did he indicate he did not understand his rights. Nothing in the interview suggested the officers were aware Avelino had any cognitive limitations or that they attempted to prey upon them. "[N]one of the police comments here appear to have been calculated to exploit a particular psychological vulnerability of defendant." (*People v. Kelly* (1990) 51 Cal.3d 931, 953.) Under the totality of the circumstances, defendant's low intelligence does not support a finding of involuntariness, since the record does not show the police used any improper tactics that took "'unfair or unlawful advantage of his ignorance, mental condition, or vulnerability to persuasion.'" (See *In re Brian W.* (1981) 125 Cal.App.3d 590, 603 [15-year-old boy with an IQ of 81 validly waived his *Miranda* rights].) Avelino's bid to overturn the court's pretrial ruling therefore fails.

---

[4] Gomez explained at trial that the range of IQ's generally considered "intellectually disabled" itself consists of gradations in which "the mild range is 55 to 70," "45 to 55 is the moderate range," and "the severe range is below 35."

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.